**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

SINAN L., et al.                                  :          CIVIL ACTION
                                                  :
                                                  :
                  v.                              :
                                                  :          NO. 06-1342
SCHOOL DISTRICT OF PHILADELPHIA                   :

## MEMORANDUM

**Baylson, J.**                                                              **June 29, 2007**

## I.      Introduction

This action was commenced by Mohamed and Aysha L. on behalf of their son, Sinan

("Plaintiffs").  The Plaintiffs allege that the Defendant, the School District of Philadelphia

("District") failed to offer Sinan a free, appropriate public education ("FAPE") for the 2005-2006

school year, in violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.

§ 1400 et seq.[1]  After failing to obtain relief at the administrative level, Plaintiffs now ask this

Court to reverse the decisions of the Special Education Hearing Officer ("Hearing Officer") and

the Special Education Due Process Appeals Review Panel of the Commonwealth of

Pennsylvania ("Appeals Panel") and order the District to reimburse the costs of a residential out-

of-state private school where they placed Sinan for the 2005-2006 school year.  In the alternative,

Plaintiffs seek one year's worth of compensatory education.  Plaintiffs also originally sought

attorney's fees and monetary damages under the IDEA, Section 1983 of the Civil Rights Act of

---

[1] As amended, 20 U.S.C. § 1400 et. seq., entitled Individuals with Disabilities Education
Improvement Act of 2004.

1964, 42 U.S.C. § 1983,[2] and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[3]

The parties submitted cross-motions for judgment on the administrative record, or, in the alternative, summary judgment, to this Court on December 11, 2006, and the Court heard oral argument on June 14, 2007.  After carefully considering the parties' arguments and reviewing the administrative record and applicable law, the Court denies the Plaintiffs' motion and grants the District's motion.

## II.    Factual and Procedural Background

Sinan L. is currently nineteen years old and resides within the District.  The District has identified Sinan as eligible for special education on the basis of a specific learning disability (neurological impairment) and a hearing impairment.  As of December 2006, he was enrolled at the Lewis School in Princeton, New Jersey.

During the 2003-2004 school year, Sinan attended eighth grade at the Orchard Friends School, a private school in New Jersey, at public expense.  Because Sinan was graduating from Orchard Friends at the end of the school year, his parents requested that a new Evaluation Report

---

[2] The Third Circuit has recently ruled that no plaintiff may claim a remedy under 42 U.S.C. § 1983 for an IDEA violation because IDEA's remedial scheme itself is comprehensive enough to preclude a § 1983 remedy.  A.W. v. Jersey City Pub. Schs., 486 F.3d 791, at *10 (2007) (en banc).  Therefore, the Court need not consider the Plaintiffs' § 1983 claim further.

[3] Section 504 of the Rehabilitation Act prohibits discrimination against handicapped persons by recipients of federal funding, such as public educational institutions.  29 U.S.C. § 794.  Remedies provided for under § 1983 are not available for Section 504 violations.  A.W., 486 F.3d at *10-12 (citing Barnes v. Gorman, 536 U.S. 181, 185 (2002)).  However, Section 504 permits private parties to seek compensatory damages, attorney's fees, and injunctive relief, but not punitive damages.  Id.  Plaintiffs may use the same conduct as the basis of claims under both IDEA and Section 504.  Andrew M. v. Del. County Office of Mental Health, --- F.3d ----, No. 2007 WL 1723604, at *9 (3d Cir. June 15, 2007).  Because Plaintiffs conceded at oral argument that they were only seeking tuition reimbursement (or compensatory education) under IDEA and not compensatory damages, the Court need not consider their Section 504 claim further.

2

("ER") be compiled in order to help determine where Sinan should be placed for the 2004-2005 school year.  The District completed the requested ER on March 30, 2004 ("March 2004 ER"), and the parents signed that report.  On the basis of the March 2004 ER, the District developed an Individualized Education Program ("IEP"), an outline of the customized curriculum for a child receiving special education, on April 14, 2004.  The parents then requested that Sinan be placed at the Hill Top School ("Hill Top"), a private day school in Rosemont, Pennsylvania, and the District agreed.

Sinan enrolled at Hill Top as a ninth-grader in the fall of 2004.  Around December 2004, Hill Top notified Sinan's parents that Hill Top was not appropriate for Sinan's needs, and that they would not renew his admission for the following year.  To help determine a new placement for the following school year, the District issued and the parents signed a "Permission to Re-evaluate" in December 2004 to initiate the process for compiling a new ER, but this ER was never completed.[4]  Instead, in March 2005, the District issued another "Permission to Re-evaluate," pursuant to which speech and language assessments were administered on March 22, 2005 ("March 2005 ER").  The new ER did not report specific reading, math, or written language grade levels, but the District, based on data provided by Hill Top, claimed it was able to make a "best-guess estimate" of Sinan's skill levels in comprehension and math for the purposes of the IEP.  (R. Ex. 10 at 18.)

On April 18, 2005, a team of teachers, clinicians, and experts from the school district

---

[4] It is unclear why no evaluations took place after the parents signed the December 2004 permission to reevaluate.  Dr. Gary Feldman, who took over as Sinan's case manager in February 2005 after Sinan's previous case manager was transferred, testified that he was unaware of the December 2004 form when he issued the second permission to reevaluate in March 2005.  (R. Ex. 9 at 3-4.)

(collectively, the "IEP team") met to draft Sinan's new IEP for use for the rest of the 2004-2005 school year and for the 2005-2006 school year. The proposed IEP ("May 2005 IEP") contained reading, writing, math, speech, and social skills goals. Because this was the first IEP created after Sinan turned sixteen, it also included a mandatory "transition plan," a road map for preparing Sinan for life after high school. The sections of the May 2005 IEP concerning Sinan's transition plan were left largely blank, aside from a notation that "Sinan will meet with school counselor to discuss prerequisites he needs to apply to college and explore college opportunities." (R. Ex. 14, Doc. S-1 at 16.) The IEP team met again on May 6, 2005 and made some revisions to the IEP's social skills goals.

While this process was taking place, beginning in February 2005, the District started to contact several schools, including the Pathway School ("Pathway") in Norristown, Pennsylvania, regarding potential placement for Sinan. On April 20, 2005, Sinan and his parents visited Pathway, which administered reading, math, speech, and social skills assessments on Sinan. Pathway informed the District the next day that they could accept Sinan for the 2005-2006 school year. The District then forwarded a copy of the IEP to Pathway.[5] Pathway extended a formal offer of admission on May 11, 2005 in a letter to the District.

While the District was seeking out new placements for Sinan, Sinan's parents were also contacting various schools in search of a suitable placement for Sinan. (R. Ex. 9 at 39.) On April 28, 2005, one of these schools, the Maplebrook School ("Maplebrook"), a private boarding

---

[5] Dr. Feldman, the District's Special Education Manager, was unclear in his testimony as to exactly when the IEP was forwarded to the Pathway School, and which version (the original April 18th version or the revised May 6th version) was sent. He was certain, however, that he forwarded a copy of the IEP to Pathway at some point in late April or early May. (Ex. 9 at 32.)

4

school in Amenia, New York, offered admission to Sinan.

On May 6, 2005, the same day as the IEP team's second meeting, the District issued a Notice of Recommended Educational Placement ("NOREP"), offering Sinan placement at an alternative special education setting on a day basis.  It is unclear whether both parties understood this proposed placement to refer to Pathway.[6]  The parents formally objected to both the NOREP and the proposed IEP.  (R. Ex. 14, Doc. S-2.)  The parents then requested due process hearings to review the District's proposals and informed the District of their intention to enroll Sinan at Maplebrook and seek reimbursement from the District for tuition expenses.[7]  They argued that Sinan's needs demanded he be placed in a residential setting, and the proposed placement at a day school amounted to a denial of a FAPE as required by the IDEA.

On May 12, 2005, the District confirmed that it was processing the parents' request for a due process hearing.  However, the District did not submit the request to the Office for Dispute Resolution until August 16, 2005.  The Hearing Officer held hearings on October 26, 2005, November 2, 2005, November 29, 2005, and December 1, 2005.  On December 31, 2005, the Hearing Officer denied the parents' request for tuition reimbursement.  The parents appealed.  On February 3, 2006, the Special Education Appeals Panel unanimously affirmed the Hearing

_____

[6] The Appeals Panel states that the parties understood the proposed placement to be the Pathway (App. Op. 3), but the NOREP makes no specific reference to Pathway (Ex. 14, Doc. S-2) and the Hearing Officer's findings of fact do not address the issue (Ex. 6 at 7).  The testimony of Dr. Feldman is unclear as to when the parents were notified of Sinan's acceptance to the Pathway School and when they learned that Pathway was the District's preferred placement under the NOREP.  (Ex. 9 at 19.)  The parents contend that the District did not identify a location at the time of issuing the NOREP, but were informed "later" (without specifying a date) that it would be the Pathway School.  (Pl.'s Br. 3, n.2.)

[7] It is unclear exactly when the parents committed to enroll Sinan at Maplebrook or started paying Maplebrook tuition.

Officer's denial of reimbursement.

The parents filed this case on March 29, 2006, seeking the Court to order the District to grant tuition reimbursement.  Currently before this Court are the parties' cross-motions for judgment on the administrative record, or, in the alternative, summary judgment, upon which the Court held oral argument on June 14, 2007.

**III.**     **Background - IDEA**

The core of the IDEA framework is the overarching requirement that all the activities of the state be directed towards ensuring that "[a] free appropriate public education is available to all children with disabilities." 20 U.S.C. § 1412(a)(1)(A).  In Board of Education v. Rowley, the Supreme Court held that a FAPE consisted of "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction."  458 U.S. 176, 188-89 (1982).  Federal funding under the IDEA is contingent on state compliance with its array of substantive and procedural requirements.  Lawrence Twp. Bd. of Educ. v. New Jersey, 417 F.3d 368, 370 (3d Cir. 2005).

A student's IEP is the main vehicle for provision of a FAPE under the IDEA.  Honig v. Doe, 484 U.S. 305 (1988); S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 265 (3d Cir. 2003).  The IEP is a written plan, created by a multi-disciplinary team, known as the IEP team, delineating a package of special educational and related services designed to meet the unique needs of a disabled child.  Carlisle Area Sch. Dist. v. Scott P., 62 F.3d 520, 526 (3d Cir. 1995).  The IEP must point toward the child's actual educational needs by including summaries of the child's abilities and present levels of educational performance, outlines of measurable educational goals, specifications for educational services to be provided, and appropriate

6

evaluation procedures and schedules for determining whether instructional objectives are being achieved.  20 U.S.C. § 1414(d)(1)(A); Pardini v. Allegheny Intermediate Unit, 420 F.3d 181, 185 (3d Cir. 2005); Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 173 (3d Cir. 1988).  For an IEP to be appropriate, it must offer a child progress in all relevant domains (behavioral, social, emotional) via "meaningful educational benefit[s]."  S.H., 336 F.3d at 265; M.C. v. Central Reg'l Sch. Dist., 81 F.3d 389, 394 (3d Cir. 1996).

The IDEA requires every public school system receiving federal funds to develop and implement an IEP for each disabled child in its jurisdiction. The IEP team is required to review each child's IEP at least annually to determine whether the child is reaching the stated goals and to revise the IEP to address lack of progress and make necessary changes arising from reevaluation of the child and parental input.  20 U.S.C. § 1414(d)(4)(A); S.H., 336 F.3d at 265 n.1.

A school district's failure to meet these requirements may constitute a denial of a FAPE. A child eligible for special education who is denied a FAPE may seek redress by enrolling in an appropriate private school and requesting reimbursement from the school district for tuition expenses.  See Sch. Comm of Town of Burlington v. Dep't of Educ., 471 U.S. 359, 369 (1996) (holding that IDEA grants courts the power to order public school authorities to reimburse parents for their expenditures on private special education if the court determines that such placement, rather than the authorities' proposed IEP, is proper under the act).  Even if the private placement that the parents choose unilaterally does not meet IDEA's definition of FAPE, the school district may still be required to reimburse tuition expenses.  Florence County Sch. Dist. v. Carter, 510 U.S. 7 (1993).

**IV.     Administrative Opinions**

7

**A.  The Hearing Officer's Opinion**

The opinion of the Hearing Officer dealt specifically with "the narrow issue of the appropriateness of the District's proffered program at the Pathway School."  (Ex. B to Def.'s Br. 8.)  The Hearing Officer conceded that the May 2005 IEP contained minor errors and was only "skeletal."  Nevertheless, she concluded that the IEP and the proposed placement at Pathway were sufficient in light of the school district's obligation to provide only an adequate plan and placement.

Specifically, the Hearing Officer found that the May 2005 IEP was based primarily on the ER issued in March 2004, supplemented by input from the Hill Top School and the March 2005 evaluation of Sinan's speech and language skills.  From this data, she found that the IEP team was able to accurately identify Sinan's strengths and weaknesses, and draft an adequate IEP accordingly.  Id. at 11.

With respect to the IEP's transition plan, the Hearing Officer conceded it was "skeletal" and noted that many sections of the plan were left blank, with the words "not needed at this time" handwritten across the top of the sections.  Id. at 12.  In her view, this confirmed that the IEP team considered the information, but concluded based on the parents' desire for Sinan to pursue post-secondary education as opposed to vocational alternatives that this information was not applicable.  Id.

After determining that the IEP was adequate, the Hearing Officer next found that Pathway was equipped to implement the District's proposed program of study.  Although no representatives from Pathway were available to testify at the hearings, the Hearing Officer concluded that the testimony and documentary evidence that the District supplied was sufficient to

8

establish that a day placement at Pathway was "appropriate" for Sinan's needs.  Id. at 13.

Placing the burden of proof on the District,[8] the Hearing Officer concluded that "[b]ased

on the totality of the evidence," the May 2005 IEP and the District's offer of placement

constituted an adequate offer of FAPE.  Id.  Because the District had met its obligation to offer an

appropriate placement, the Hearing Officer reasoned that it was unnecessary to consider the

appropriateness of Maplebrook as a placement or out of equitable concerns.  Accordingly, the

Hearing Officer denied tuition reimbursement to Sinan.

### B. The Appeals Panel's Decision

The parents appealed, asserting that the Hearing Officer erred in determining that the

---

[8] While the burden of proof in IDEA challenges was originally placed on school districts in the Third Circuit, see Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1219 (3d Cir. 1993), the Supreme Court held in Schaffer v. Weast, 546 U.S. 49 (2005), that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief."

The Supreme Court issued Schaffer after the Hearing Officer had commenced the hearings in this case, but before she reached a final decision.  While acknowledging the impact of Schaffer, the Hearing Officer nevertheless placed the burden of proof on the District.  (Ex. B to Def.'s Br. 10 n.4.)  The Third Circuit subsequently acknowledged in L.E. v. Ramsey Bd. of Educ.,435 F.3d 384 (3d Cir. 2006), that Schaffer superseded its previous holding in Oberti.  Citing L.E., the Appeals Panel noted that, while the Hearing Officer erred in placing the burden of proof on the District, the preponderance of the evidence nonetheless supported a finding that the District's proposed program and placement was appropriate.  (Ex. A. to Def.'s Br. 6 n.40.)

Plaintiffs contend that Schaffer and its progeny do not impact the Court's burden of proof analysis because the Supreme Court did not specify that its decision should apply retroactively.  However, numerous courts that have decided IDEA cases since Schaffer have held that the new burden of proof standard must apply to all cases that were pending when Schaffer was decided.  See, e.g., Fisher v. Stafford Twp. Bd. of Educ., No. 05-2020, 2006 WL 2534399, at *3 (D.N.J. Aug. 31, 2006); Greenwood v. Wissahickon Sch. Dist., No. 04-3880, 2006 WL 279085, at *1 (E.D. Pa. Feb. 3, 2006) (Savage, J.); Bay Shore Union Free Sch. Dist. v. T., 405 F. Supp. 230, 238 (E.D.N.Y. 2005).

Nevertheless, as the Appeal Panels observed, because the Hearing Officer found in favor of the District, placing the burden of proof on the parents would not result in a different outcome.  Therefore, it is unnecessary for this Court to reach a determination on the applicability of Schaffer to this case.

District had offered Sinan FAPE for the 2005-2006 school year.  On February 3, 2006, the

Appeals Panel issued a unanimous, seven-page decision that affirmed the Hearing Officer's

opinion in its entirety.

The Appeals Panel first addressed the parents' challenge to the adequacy of the March

2004 ER.  While conceding that the "ER was far from optimal," the panel asserted that it was

adequate "as a reevaluation for programming and placement purposes."  Likewise, the panel

found the March 2005 ER, which was only limited to reevaluating Sinan's need for speech-

language therapy ("SLT"), was adequate because his parents had only requested refinements in

this field.[9]  (Ex. A to Pl.'s Br. 5.)

The next issue the panel considered was the May 2005 IEP.  While conceding that the

present education levels listed in the IEP "were far from precise," the panel concluded that "they

were reasonable in light of Pathway's thorough intake evaluation-customization process."  Id.

The panel also rejected the parents' attack on the transition plan, concluding that "the deficiencies

in the transition plan were not fatal in light of the Parents' initial focus and Pathway's foreseeable

fine-tuning process."  Id. at 6.

## V.    Legal Standard

Parties who have exhausted administrative remedies in an IDEA dispute have the right to

bring a civil action in the district court, without regard to the amount in controversy.  20 U.S.C. §

1415(i)(2)-(3).

In reviewing an administrative adjudication of an IDEA dispute, the Court is required to

---

[9] The Plaintiffs dispute this finding.  They claim that throughout the process of requesting
and completing the March 2005 ER, they sought to have the District reevaluate all of Sinan's
educational and functional needs.  (Pl.'s Br. 2-3.)  See discussion infra Part VI.A.1.

give "due weight" to the findings of state administrative proceedings.  See Rowley 458 U.S. at

206-07 (interpreting 20 U.S.C. § 1415(i)(2)(C), which requires district courts to "receive" the

administrative record, as also including "the implied requirement that due weight shall be given to

those proceedings").[10]  The Third Circuit has interpreted the "due weight" standard as requiring

district courts to conduct a "modified *de novo*" review of administrative judgments below.  S.H.,

336 F.3d at 269-70.  Under this standard, "[f]actual findings from the administrative proceedings

are to be considered prima facie correct."  Id. (citing M.M. v. Sch. Dist. of Greenville County, 303

F.3d 523, 531 (4th Cir. 2002)).  The Court must defer to these findings "unless it can point to

contrary non-testimonial extrinsic evidence on the record."  Id. at 270.  The Court is not free to

"substitute [its] own notions of sound educational policy for those of the school authorities which

they review."  Rowley, 458 U.S. at 206.

**VI.    Discussion**

        Sinan and his parents contend that the District's offer of a day placement at Pathway was

inadequate and did not constitute a FAPE.  First, they assert that the March 2004 and March 2005

ERs, which formed the basis of the May 2005 IEP, failed to include any meaningful assessments

of Sinan's educational functioning.  Second, they argue that the May 2005 IEP is materially

inadequate because it fails to contain measurable annual goals and a complete post-secondary

---

[10] The full text of 20 U.S.C. § 1415(i)(2)(C), reads as follows:

        Additional requirements: In any action brought under this paragraph, the court--
        (i) shall receive the records of the administrative proceedings;
        (ii) shall hear additional evidence at the request of a party; and
        (iii) basing its decision on the preponderance of the evidence, shall grant
        such relief as the court determines is appropriate.

transition plan, which IDEA requires be part of a child's first IEP after he turns sixteen.  Finally, the parents contend that the District's failure to abide by procedural deadlines set forth in the IDEA statute entitles them to tuition reimbursement.

Under the Supreme Court's precedents in <u>Burlington</u> and <u>Carter</u>, a three-step analysis should be applied to determine whether to order tuition reimbursement.[11]  Known as the "Burlington-Carter" test, the Court must first determine if the District's proposed IEP constituted an appropriate offer of a FAPE.[12]  <u>Carter</u>, 510 U.S. at 16.  If it is not, the Court should next determine whether the parents' unilateral placement of the child at a private school was "proper."[13]  <u>Id.</u>  Finally, the Court should consider whether "equitable considerations are relevant in fashioning relief."  <u>Burlington</u>, 471 U.S. at 374.

---

[11] The Plaintiffs also ask the Court to award compensatory education in the event it determines tuition reimbursement to be an inappropriate remedy.  Compensatory education is an appropriate remedy when a school district has failed to provide a FAPE to a student under the first prong of the Burlington-Carter test in order to replace lost educational services to the student resulting from the district's failure.  <u>See</u> <u>P.G. v. S. York County Sch. Dist.</u>, No. 04-2221, 2006 WL 3042966, at *2 n.5 (M.D. Pa. Oct. 24, 2006).  Because the Court determines that the District provided Sinan with a FAPE, compensatory education would not be an appropriate remedy here.

[12] According to 20 U.S.C. § 1401(9), a school district's offer of a FAPE must:

> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

[13] The standard for whether a parent's unilateral private placement is "proper" is less strict than the standard for determining whether a school district's proposed IEP and placement is "appropriate."  For instance, although the parents' placement must meet the other standards of the IDEA, unlike a school district's proposed offer of a FAPE, it need not meet the exacting standards of 20 U.S.C. § 1401(9).  <u>See</u> <u>Carter</u>, 510 U.S. at 12-13.

**A.  Adequacy of IEP**

Under the first prong of the Burlington-Carter test, an IEP must be "reasonably calculated to enable the child to receive educational benefits."  Rowley, 458 U.S. at 192, 206-07.  The IEP "must result in more than *de minimis* benefits." M.C., 81 F.3d at 393 ("[S]tates must provide some sort of meaningful education - more than mere access to the schoolhouse door."); Bd. of Educ. of E. Windsor Reg'l Sch. Dist. v. Diamond, 808 F.2d 987, 991 (3d Cir. 1986) ("[IDEA] requires a plan likely to produce progress, not regression or trivial educational advancement."). The IEP must provide "significant learning," Polk, 853 F.2d at 182, and confer a "meaningful benefit," tracked "in relation to the child's potential."  Id. at 184-85.  In addition, 20 U.S.C. § 1415 dictates that the District, in shaping the IEP, must also adhere to various procedural standards.  Id. at 205-06.

**1.  Statement of Educational Levels**

The parents argue that the May 2005 IEP is inadequate because it failed to include current or meaningful assessments of Sinan's educational levels.  Specifically, they contend that the statement of Sinan's educational levels contained in the May 2005 IEP was based largely on the ER completed in March 2004, which they claim was both outdated and substantively insufficient. Furthermore, they argue that the ER created in March 2005 was incomplete, as it only assessed Sinan's speech and language needs.  The District claims that the IEP team correctly determined that the data before them was sufficient to create an adequate IEP.

Because an IEP must contain a statement of the student's educational levels, 20 U.S.C. § 1414 (d)(1)(A)(i)(I), school districts will often prepare an ER to obtain those levels.  To create a proper ER, the IEP team must review all existing evaluation data, including "current classroom-

13

based assessments and observations," and information provided by the parents.  20 U.S.C. §
1414(c)(1); 34 C.F.R. § 300.533(a) (2005).  Next, the IEP team must "identify what additional
data, *if any*, is needed to determine," *inter alia*, "the present levels of performance and educational
needs of the child," and then decide "whether any additions or modifications to the special
education and related services are needed to enable the child to meet the substantive annual goals
set out in the [IEP] of the child."  20 U.S.C. §1414(c)(1) (emphasis added).

The Hearing Officer found the March 2004 ER to be adequate, and that conclusion is
supported by this Court's review of the record.  The March 2004 ER was based on an
occupational therapy assessment conducted on March 19, 2004 (R. Ex. 14, Doc. S-13) and a
psychoeducational evaluation conducted by a licensed psychologist on March 24, 2004 (R. Ex 15,
Doc. P-2).  The psychoeducational evaluation included achievement test scores in reading, math,
and writing.  The evaluation also contained achievement test results for verbal comprehension,
perceptual reasoning, working memory, processing speed, and visual motor integration.  (R. Ex.
15, Doc. P-1 at 4-5.)[14]

Plaintiffs contend that the March 2005 ER was also inadequate because it was limited to
evaluating Sinan's speech and language needs.  The Appeals Panel found that the limited nature
of that ER was appropriate because the parents themselves had only requested a speech
evaluation.  (Ex. A to Pl.'s Br. 5.)  This finding is supported by the evidence in the record and
should be given due weight.  In the pre-evaluation input form, the parents expressed particular

---

[14] Although Plaintiffs complain that the psychoeducational evaluation was based on
outdated information and was "not typically used for a comprehensive evaluation of academic
skills" (Pl.'s Br. 12), as Dr. Feldman testified, such as evaluation can serve both as an
independent screening device and a mechanism to corroborate other information.  (R. Ex. 9 at
11.)

concern about Sinan's speech skills. (R. Ex. 14, Doc. S-15).  In addition, Dr. Feldman, the

District's Special Education Manager as well as Sinan's case officer, testified that his

understanding was that the re-evaluation should be confined to evaluating Sinan's speech skills.

(R. Ex. 9 at 4.)

When the IEP team met in April, they considered whether additional evaluation data

would be necessary in order to obtain an accurate estimate of Sinan's educational levels.

According to Dr. Feldman, the team ultimately concluded they had sufficient information to form

adequate estimates of those levels based on the 2004 and 2005 ER and the information supplied

by Hill Top.  (R. Ex. 9 at 7; Ex. 10 at 17-18.)  The Hearing Officer agreed with this determination,

finding that the information provided to the IEP team was sufficient to allow the District to

accurately "surmise" Sinan's skill levels in comprehension and math.  Plaintiffs cite to no

extrinsic, non-testimonial evidence that contradicts the determinations of the Hearing Officer and

the Appeals Panel that the IEP team had sufficient information to evaluate Sinan's educational

levels,[15] and this Court will therefore accord those determinations due weight.  As the Appeals

Panel observed, particularly in light of the thorough intake evaluation-customization process

undertaken by Pathway for all incoming students, the May 2005 IEP contained an adequate

_____

[15]  At oral argument, Plaintiffs cited to the two-page letter written by Sinan's social
worker at Hill Top, which contained a number of generalized statements about Sinan's academic
performance, as evidence contradicting the May 2005 IEP.  This letter was written several weeks
after Sinan's May 2005 IEP was issued and does little to counter the weight of the evidence
supporting the May 2005 IEP, including the March 2004 and March 2005 ERs and the
information supplied by Sinan's teachers at Hill Top.
Plaintiffs further asserted that Dr. Feldman's use of the phrase "best guess estimate"
during his testimony at the hearing supports their contention that Sinan's educational levels were
based on insufficient data.  As testimonial evidence, this Court will defer to the Hearing Officer's
decision to credit Dr. Feldman's ultimate conclusion that the IEP team had sufficient information
to assess Sinan's educational levels.

statement of Sinan's current educational levels.

### 2. Measurable Annual Goals

In addition to challenging the adequacy of the May 2005 IEP's statement of Sinan's educational levels, the Plaintiffs also argue that the IEP was inadequate for lacking measurable annual goals that are "meaningful and appropriate."  The District contends that the goals were adequately responsive to Sinan's needs.

The IEP must contain "measurable annual goals" that relate to "meeting the child's needs . . . to enable him to progress in the general curriculum."  20 U.S.C. § 1414(d)(1)(A).  The goals must also aim to meet " the child's other educational needs that result from the child's disability."  Id.  The term "other educational needs" is understood to encompass the child's needs *outside* the classroom, where warranted.  M.C., 81 F.3d at 393-94 (3d Cir. 1995) (upholding the district court's transfer of a severely mentally retarded sixteen-year old, who made little progress in an approved day setting for five years, to a residential school); Polk, 853 F.2d at 181-82 (arguing that IDEA's legislative history shows that "fostering self-sufficiency in handicapped children" was an important goal of the act).

Although the Hearing Officer acknowledged that some goals listed in the May IEP contained minor errors, she found them to be sufficiently responsive to Sinan's overall needs. (Ex. B to Def.'s Br. 11.)  After extensively reviewing the IEP, this Court finds no reason to overrule the Hearing Officer's finding that meaningful educational progress would have been possible under this plan.  The IEP contains statements of current performance and measurable annual goals in the fields of literacy, math, speech and social skills.  (R. Ex. 14, Doc. S-1 at 5A-H.)  Moreover, under each field, the IEP contains two to four short term objectives that are to be

used to help measure progress toward the annual goals.   _____

_____ 3. **Transition Plan**

The parents also contend that the IEP's post-secondary transition plan was inadequate. Although the plan provides for Sinan to meet with a college guidance counselor, the parents argue that the failure to mention training for vocations and practical living makes it incomplete.  The District responds that the transition plan was appropriate based on the parents' own insistence on limiting the plan to college preparation and excluding vocational goals.  At oral argument, the Plaintiffs contended that, while they wanted Sinan's curriculum to emphasize college preparation, they did not intend for the transition plan to focus on college planning to the exclusion of vocational and practical training.  The Plaintiffs further argued that the IDEA obligates the District to plan for a student's vocational and practical training no matter what the expressed desires of the parents are.

The IDEA requires that every IEP created after the child becomes sixteen years of age must also include a statement of "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills."  20 U.S.C. § 1414(d)(1)(A)(i)(VIII).  Transition planning should be "based upon the individual student's needs, taking into account the student's preferences and interests" and "*when appropriate*," should provide for "acquisition of daily living skills and functional vocational evaluation."  20 U.S.C. § 1401(34) (emphasis added).[16]

_____

[16]The full text of 20 U.S.C. § 1401(34) reads as follows:

The term "transition services" means a coordinated set of activities for a student with a disability that –
(A) is designed within an outcome-oriented process, which

The Third Circuit has not offered definitive guidance on whether a transition plan must provide for vocational and practical education.[17]   However, the Seventh Circuit has recently ruled that a school district's failure to include a transition plan in an IEP is a mere procedural flaw and does not violate any substantive rights.  Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross, --- F.3d ----, No. 05-3700, 2007 WL 1374919, at *7-8 (7th Cir. May 11, 2007).  Overall, the case law does not offer strong support for the Plaintiffs' proposition that the District has an affirmative duty to provide for vocational and practical training in all transition plans, without regard to a student's individual needs and preferences.  The Hearing Officer found that the transition plan's focus on college planning to the exclusion of practical training was appropriate for Sinan given his parents' rejection of any vocational outcome.  (Ex. B to Pl.'s Br. 12.)   Considering that the IDEA statute itself requires functional and vocational planning only "when appropriate," the Court concludes that the transition plan's focus on college planning was appropriate given Sinan's

---

promotes movement from school to post-school activities, including post-secondary education, vocational training, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;
(B) is based upon the individual student's needs, taking into account the student's preferences and interests; and
(C) includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and when appropriate, acquisition of daily living skills and functional vocational evaluation.

[17] Although a 1999 decision by Judge Padova upheld an Appeals Panel award of compensatory education on the ground that a school district had failed to provide adequate post-secondary transition planning, that decision was premised on the District's violation of several specific Commonwealth regulations on transition planning that were later repealed in 2001, see 22 Pa. Code §§ 14.37, 342.37.  See East Penn Sch. Dist. v. Scott B., No. 97-1989, 1999 WL 178363, at *5-6, 9 (E.D. Pa. Feb. 23, 1999).

needs, preferences and interests at the time.

### 4. <u>Appropriateness of Placement in a Private Day School</u>

Sinan's parents further contend that the District's offer of placement in a special day school was not an offer of a FAPE, arguing that Sinan could only receive a meaningful educational benefit in a residential placement.  The District argues that none of the information supplied by the ERs, Hill Top, and the parents themselves showed that Sinan could not make meaningful educational progress in a day setting.

Under the IDEA, a school district must place a student "in the least restrictive environment that will provide [him] with meaningful educational benefit."[18]  <u>T.R. v. Kingwood Township Bd. of Educ.</u>, 205 F.3d 572, 578 (3d Cir. 2000) (interpreting 20 U.S.C. § 1412(a)(5)(A)).  This requires the District to place a disabled child, to the maximum extent possible while still assuring that he or she receives a satisfactory education, "together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled."  <u>Carlisle Area Sch. v. Scott P.</u>, 62 F.3d 520, 535 (3d Cir. 1995).  Applying the same logic to whether placement in a residential setting is appropriate, the Third Circuit has observed that "placement in a

---

[18] The IDEA's "least restrictive environment" mandate requires:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

residential center is appropriate . . . where a less structured environment cannot do the job." <u>M.C.</u>, 81 F.3d at 394.

In arguing that only a residential placement would be appropriate for Sinan, the Plaintiffs rely on a two-page letter by Sinan's social worker at Hill Top written several weeks after they rejected the placement at Pathway.  (R. Ex. 15, Doc. P-3.)  The letter stated that Sinan's "education needs extend beyond the hours of a traditional school day" and that he "would benefit greatly from a program that provides more individualized instruction and attention." <u>Id.</u>  The Hearing Officer found that Pathway, the District's proffered placement, could meet these needs with its small class sizes and extensive after-school programs.  (Ex. 2 to Def.'s Br. 8, 13.) Plaintiffs' argument that this letter may serve as non-testimonial, extrinsic evidence contradicting the determination of the Hearing Officer on this issue fails to convince.  The letter was written several weeks after the Plaintiffs had already rejected the IEP and proposed day placement.  The Court agrees that the IEP and proposed placement at a special day school were sufficiently responsive to the concerns outlined in the letter.

### 5. <u>Delays in March 2005 ER and Due Process Hearing</u>

Sinan and his parents claim that the District's failure to comply with IDEA's procedural deadlines in itself entitles them to tuition reimbursement.  It is undisputed that the District failed to complete the ER requested in late 2004 until March 30, 2005, and that the District failed to process the parents' request in May 2005 for a due process hearing for three months, with no hearings taking place until October 2005.  Plaintiffs claim that these delays left them no choice but to pursue placement at Maplebrook.  The District asserts that it was relocating its office of

legal counsel at the time that Plaintiffs submitted their request and this relocation caused their delay in processing that request.

The IDEA requires each state to enact a set of procedural safeguards to help ensure the right to a FAPE.  20 U.S.C. § 1415(a).   Pennsylvania has promulgated two safeguards pursuant to the  IDEA that are relevant here.  The first is the requirement that an ER be issued within sixty days of when the District receives the request for reevaluation.  22 Pa. Code § 14.124.  The second is that a due process hearing be convened within thirty days after a party has requested review.  22 Pa. Code § 14.162(q)(1).

The Supreme Court has said that "the importance Congress attached to these procedural requirements cannot be gainsaid."  Rowley, 458 U.S. at 205-06.  However, it is unclear what kind of relief Plaintiffs may be entitled to as a result of the District's violation of procedural safeguards alone.  Plaintiffs point to Muth v. Cent. Bucks Sch. Dist., 839 F.2d 113 (3d Cir. 1988), rev'd on other grounds sub nom. Dellmuth v. Muth, 491 U.S. 223 (1989), and Rose v. Chester County Intermediate Unit, No. 95-239, 1996 WL 238699 (E.D. Pa. May 7, 1996) (Giles, J.), aff'd without opinion, 114 F.3d 1173 (3d Cir. 1997), in support of their contentions.  However, Muth awarded tuition reimbursement under rather unique circumstances where the Third Circuit found that the Commonwealth's entire statutory scheme for administrative review did not meet the requirements of the IDEA.  Likewise, while Judge Giles of this Court concluded in Rose that the school district's delays constituted a procedural violation, his suggestion that the delays in themselves could entitle the plaintiffs to tuition reimbursement was dicta because he also concluded that the school district's IEP was substantively inadequate before awarding tuition reimbursement.  See Rose, 1996 WL 238699, at *5-8, 11.

In the absence of definitive Third Circuit authority on whether a school district's procedural defaults alone may entitle a plaintiff to tuition reimbursement, the Court will briefly discuss other how other jurisdictions have dealt with this issue.  The dominant view among the Circuits that have ruled on this issue is that a school district's violation of the IDEA's procedural safeguards does not entitle a parent to reimbursement unless it results in a denial of a FAPE.  See, e.g., Knable v. Bexley City Sch. Dist., 238 F.3d 755, 764 (6th Cir. 2001) ("Only if we find that a procedural violation has resulted in . . . substantive harm . . . may we grant such relief as the court determines is appropriate." (internal quotations omitted)); Heather S. v. Wisconsin, 125 F.3d 1045, 1059 (7th Cir. 1997) ("[T]he delay itself did not necessarily violate [plaintiff's] rights.  The question is whether the delay deprived [plaintiff] of . . . a [FAPE]."); W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23, 960 F.2d 1479, 1484 (9th Cir. 1992) ("Procedural flaws do not automatically require a finding of a denial of a FAPE.  However, procedural inadequacies that result in the loss of educational opportunity . . . clearly result in the denial of a FAPE." (internal citations omitted)); Burke County Bd. of Educ. v. Denton, 895 F.2d 973, 982 (4th Cir. 1990) (upholding denial of compensatory education because the school board's procedural faults did not cause plaintiff to lose any educational opportunity).

Furthermore, this Court has also held in past cases that a school district's procedural default is not a cause for relief in the absence of a substantive violation.  See Robert B. v. W. Chester Area Sch. Dist., No. 04-2069, 2005 WL 2396968, at *9 (E.D. Pa. Sept. 27, 2005) (Baylson, J.) (holding that a school district's failure to include a "regular education teacher" on the IEP team as required by the IDEA did not entitle student challenging IEP to relief).  Likewise, Judge Surrick of this Court has held that a school district's failure to convene a due process

22

hearing for more than one year after parents' initial request is not sufficient to entitle parents to tuition reimbursement.  Caitlin W. v. Rose Tree Media Sch. Dist., No. 03-6051, 2004 WL 3009027, at *5 (E.D. Pa. Dec. 29, 2004) ("Plaintiffs rely solely on the fact that [the school district] violated the IDEA through its failure to grant Plaintiffs a due process hearing in a timely manner.  This is not sufficient.").[19]

Thus, the relevant inquiry here should not be whether the District violated the IDEA's procedural safeguards, but whether the District's violations deprived Sinan of a substantive right such as a FAPE.  The Hearing Officer and Appeals Panel did not address this issue, but the Court has carefully considered this matter and concludes that the District's procedural shortcomings did not cause Sinan to be deprived of a FAPE.  The parents speculate that an earlier ER may have resulted in more precise estimates of Sinan's educational levels and a more thorough IEP.  Yet the Court has concluded that, while some aspects of the May 2005 IEP might not have been optimal, it met the minimum baseline requirements of the IDEA.  The delay in convening the due process hearing does not change the fact that the District's proposed IEP and day placement were adequate under the requirements of the IDEA.  The parents may not have chosen to shoulder the expense of enrolling Sinan at Maplebrook had a timely due process hearing determined before the start of the school year that the District's proffered IEP and placement was adequate.  However, the Supreme Court has held that parents who "unilaterally change their child's placement during the pendency

_____

[19] Caitlin W. also declined to follow another case on which Plaintiffs rely, Krawitz v. Commonwealth, Dep't of Educ., 408 A.2d 1202 (Pa. Commw. 1979), on the grounds that Krawitz was premised solely on state law and decided prior to the enactment of the IDEA. Caitlin W., 2004 WL 3009027, at *4, n.7.  For the same reason, this Court also declines to follow Krawitz.

of review proceedings, without the consent of state or local school officials, do so at their own financial risk." <u>Burlington</u>, 471 U.S. at 373-74.

Because eligibility for tuition reimbursement is predicated on a denial of a FAPE, the Court need not consider the appropriateness of Sinan's placement at Maplebrook or equitable principles.

**VII.   <u>Conclusion</u>**

As any good parent, Sinan's parents understandably want the very best for their son. Unfortunately, given financial and practical constraints, Congress and the legislature have not imposed the obligation on our public school systems to satisfy the desires of every child and parent who seeks their services.  Instead, schools are held to a minimum baseline standard, a standard that may fail to meet the expectations of the parents of disabled and non-disabled children alike.  Whatever the substantive merits of this standard may be, it is the standard that the Court is bound to enforce.

An appropriate Order follows.

O:\CIVIL\06-1342, Sinan L. v. School Dist Phila\Sinan L. v. School District of Philadelphia, 06-1342 Cross Motion Memo.wpd

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SINAN L., et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 06-1342 |
| SCHOOL DISTRICT OF PHILADELPHIA | : | |

## **ORDER**

AND NOW, this 29th day of June, 2007, after careful and independent consideration of the parties' cross-motions for disposition on the administrative record, it is hereby ORDERED as follows:

1.      Plaintiffs' Motion for Disposition on the Administrative Record (Doc. No. 12) is DENIED.

2.      Defendant's Motion for Disposition on the Administrative Record (Doc. No. 13) is GRANTED.

3.      The Clerk is directed to enter judgment in favor of Defendant and against Plaintiffs and mark this case as closed.

BY THE COURT:

s/Michael M. Baylson
Michael M. Baylson, U.S.D.J.